[ORAL ARGUMENT NOT YET SCHEDULED]
No. 22-5253

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

CONCERT INVESTOR, LLC,

*Plaintiff-Appellant,*

*- v. -*

SMALL BUSINESS ADMINISTRATION; ISABELLA CASILLAS
GUZMAN, ADMINISTRATOR, SMALL BUSINESS
ADMINISTRATION,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Columbia
Case No. 1:21-CV-03150-CJN

**FINAL BRIEF FOR PLAINTIFF-APPELLANT
CONCERT INVESTOR, LLC**

Michael Weisbuch
AKIN GUMP STRAUSS HAUER &
  FELD LLP
100 Pine Street
Suite 3200
San Francisco, CA 94111
(415) 765-9500

James E. Tysse
Caroline L. Wolverton
Lide E. Paterno
Michael W. Fires
AKIN GUMP STRAUSS HAUER &
  FELD LLP
2001 K Street NW
Washington, D.C. 20006
(202) 887-4000
jtysse@akingump.com

*Attorneys for Plaintiff-Appellant Concert Investor, LLC*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**A.    <u>Parties and Amici</u>**

Plaintiff-Appellant is Concert Investor, LLC.

Defendants-Appellees are the Small Business Administration, Isabella Casillas Guzman, Administrator, Small Business Administration.

There are currently no parties who have intervened or moved to file an *amicus* brief before this Court.

**B.    <u>Rulings Under Review</u>**

The rulings under review are the Order denying Plaintiff-Appellant's Motion for Summary Judgment, granting Defendants-Appellees' Cross-Motion for Summary Judgment, and entering judgment for Defendants-Appellees (ECF No. 74) (JA 786), the accompanying opinion (ECF No. 73) (JA 769-785), and all orders encompassed within the final judgment, issued by the Honorable Carl J. Nichols.  The Order and opinion were entered by the United States District Court for the District of Columbia on July 25, 2022.

**C.    <u>Related Cases</u>**

Counsel is not aware of related cases.

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, Plaintiff-Appellant states that Concert Investor, LLC is a Tennessee corporation that produces, organizes, and manages live concerts and other events by performing artists. Concert Investor, LLC has no parent company, and no publicly held company has a 10% or greater ownership interest in Concert Investor, LLC.

*/s/ James E. Tysse*
James E. Tysse

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ........................................................................................... i

TABLE OF AUTHORITIES ................................................................. v

GLOSSARY ....................................................................................... ix

JURISDICTIONAL STATEMENT ...................................................... 1

STATEMENT OF ISSUES.................................................................. 2

STATUTES AND REGULATIONS .................................................... 3

INTRODUCTION................................................................................ 3

STATEMENT OF THE CASE ............................................................ 5

    I.     STATUTORY FRAMEWORK.................................................... 5

    II.    FACTUAL BACKGROUND..................................................... 9

        A.    Concert Investor's Business........................................... 9

        B.    The Banditø Tøur ........................................................ 10

        C.    The COVID-19 Pandemic........................................... 15

    III.   PROCEDURAL HISTORY..................................................... 15

SUMMARY OF ARGUMENT .......................................................... 21

STANDARD OF REVIEW................................................................ 23

ARGUMENT .................................................................................... 24

    I.     THE SBA ACTED ARBITRARILY, CAPRICIOUSLY, AND CONTRARY TO LAW IN DENYING CONCERT INVESTOR'S GRANT APPLICATION. ................................. 24

        A.    Concert Investor Produces, Organizes, And Manages Live Concerts............................................... 25

        B.    The SBA Erroneously Concluded That Concert Investor Is Not A Live Performing Arts Organization Operator............................................... 28

C.    The Government's Arguments Are Unpersuasive ...... 41

D.    In All Events, A "Lighting And Sound Producer" Is Still A "Producer" ........................................................ 49

II.    AT A MINIMUM, REMAND TO THE AGENCY IS REQUIRED ................................................................... 52

A.    The District Court Erred In Crediting The Agency's *Post Hoc* Interpretation Of The Word "Produces" ............................................................... 52

B.    The District Court Erred In Granting Summary Judgment On Concert Investor's Claim Of Disparate Treatment ................................................... 55

CONCLUSION .......................................................................... 60

ADDENDUM

15 USC § 9009a .......................................................... Add. 1

# TABLE OF AUTHORITIES

## CASES:

*Alpharma, Inc. v. Leavitt,*
   460 F.3d 1 (D.C. Cir. 2006) ................................................................ 53

*American Ass'n of Cosmetology Schools v. Devos,*
   258 F. Supp. 3d 50 (D.D.C. 2017) ...................................................... 52

*ANR Storage Co. v. Federal Energy Regul. Comm'n,*
   904 F.3d 1020 (D.C. Cir. 2018) .................................................... 56, 59

*Ark Initiative v. Tidwell,*
   816 F.3d 119 (D.C. Cir. 2016) ............................................................ 23

*Associated Builders & Contractors, Inc. v. Herman,*
   166 F.3d 1248 (D.C. Cir. 1999) .......................................................... 24

*Association of Am. R.Rs. v. Costle,*
   562 F.2d 1310 (D.C. Cir. 1977) .................................................... 25, 42

*AT&T Corp. v. FCC,*
   86 F.3d 242 (D.C. Cir. 1996) .............................................................. 37

*Baltimore Gas & Elec. Co. v. Federal Energy Regul. Comm'n,*
   954 F.3d 279 (D.C. Cir. 2020) ............................................................ 56

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.,*
   419 U.S. 281 (1974) ...................................................................... 37, 38

*Christopher v. SmithKline Beecham Corp.,*
   567 U.S. 142 (2012) ............................................................................ 54

*City of Dania Beach v. FAA,*
   628 F.3d 581 (D.C. Cir. 2010) ............................................................ 58

*CTS Corp. v. EPA,*
   759 F.3d 52 (D.C. Cir. 2014) .............................................................. 58

*Delaware Riverkeeper Network v. FERC,*
   753 F.3d 1304 (D.C. Cir. 2014) .......................................................... 40

*Department of Homeland Sec. v. Regents of the Univ. of Cal.*,
140 S. Ct. 1891 (2020) ............................................................... 52, 54

*Edison Elec. Inst. v. EPA*,
391 F.3d 1267 (D.C. Cir. 2004) ......................................... 40

*Forsyth Mem'l Hosp., Inc. v. Sebelius*,
639 F.3d 534 (D.C. Cir. 2011) ........................................... 24

*Genuine Parts Co. v. EPA*,
890 F.3d 304 (D.C. Cir. 2018) ........................................... 38

*Hill Dermaceuticals, Inc. v. Food & Drug Admin.*,
709 F.3d 44 (D.C. Cir. 2013) .............................................. 57

*Independent Petroleum Ass'n of Am. v. Babbitt*,
92 F.3d 1248 (D.C. Cir. 1996) ............................................ 56

*Kreis v. Secretary of Air Force*,
406 F.3d 684 (D.C. Cir. 2005) ............................................ 55

*Lamie v. United States Tr.*,
540 U.S. 526 (2004) ........................................................... 46

*Local 814, Int'l Bhd. Of Teamsters v. NLRB*,
546 F.2d 989 (D.C. Cir. 1976) ........................................... 53

*Mercy Hosp., Inc. v. Azar*,
891 F.3d 1062 (D.C. Cir. 2018) ......................................... 47

*Michigan v. EPA*,
576 U.S. 743 (2015) ........................................................... 52

*Morall v. DEA*,
412 F.3d 165 (D.C. Cir. 2005) ........................................... 37

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut.
Auto. Ins. Co.*,
463 U.S. 29 (1983) ......................................................... 40, 52

*SEC v. Chenery Corp.*,
318 U.S. 80 (1943) ............................................................. 52

vi

*State of Wisconsin v. EPA*,
  938 F.3d 303 (D.C. Cir. 2019) ........................................... 49

*Westar Energy, Inc. v. Federal Energy Regul. Comm'n*,
  473 F.3d 1239 (D.C. Cir. 2007) ......................................... 56

*Yates v. United States*,
  574 U.S. 528 (2015) ........................................................ 46

**STATUTES:**

5 U.S.C.
  § 702 ................................................................................ 1

15 U.S.C.
  § 9009a(a)(1)(A) ............................................... 8, 44, 54
  § 9009a(a)(1)(A)(i)(II) ............................................... 7
  § 9009a(a)(1)(A)(iii) ................................... 9, 30, 31, 48
  § 9009a(a)(1)(A)(vi)(I) ............................................. 48
  § 9009a(a)(1)(A)(vi)(II) ............................................ 48
  § 9009a(a)(3) ............................................................ 54
  § 9009a(a)(3)(A) ...................................................... 29
  § 9009a(a)(3)(A)(i) ............................................... 29, 30
  § 9009a(a)(3)(A)(i)(I) ................... 8, 19, 25, 26, 28, 45
  § 9009a(a)(3)(A)(i)(II) ............................................... 8
  § 9009a(a)(3)(B) ...................................................... 47
  § 9009a(b)(3)(A) ........................................................ 7
  § 9009a(c) .................................................................. 7
  § 9009a(c)(1)(A)(i) ................................................... 16
  § 9009a(c)(1)(C) ....................................................... 16
  § 9009a(c)(2) ............................................................ 16

28 U.S.C.
  § 1291 ............................................................................ 1
  § 1331 ............................................................................ 1

Pub. L. No. 116-260, 134 Stat. 1182 (2020) ..................... 6, 7

Pub. L. No. 117-2, 135 Stat. 4 (2021) ................................... 7

Pub. L. No. 117-328, 136 Stat. 4459 (2022) ......................... 1

### OTHER AUTHORITIES:

166 CONG. REC. S5485-S5486 (daily ed. Sept. 9, 2020)
(statement of Sen. John Cornyn)..........................................................6

*Am. Heritage Dictionary of the English Language* (5th ed.
2022)....................................................................................................44

BERKLEE COLL. OF MUSIC, *What does a Concert/Event
Producer do?*.......................................................................................43

DILGER, ROBERT JAY, ET AL., CONG. RSCH. SERV., R46689, SBA
SHUTTERED VENUE OPERATORS GRANT PROGRAM (SVOG)
(2022).............................................................................................. 5, 6

FED. R. APP. P. 4(a)(1)(B) ..........................................................................1

*Merriam-Webster's Dictionary*.................................................................44

*Oxford's English Dictionary* ....................................................................43

Peoples, Glenn, *Live Nation Turns in Record Quarter as
Touring Business Booms*, BILLBOARD, Nov. 3, 2022..........................48

Press Release (No. 21-75), SBA, *SBA Opens Supplemental
Grant Applications for Shuttered Venue Operators Grant
Awardees* (Aug. 27, 2021) ...................................................................7

SBA, *About SVOG* ......................................................................................7

SCALIA, ANTONIN & BRYAN A. GARNER, READING LAW: THE
INTERPRETATION OF LEGAL TEXTS (2012) ...........................................47

U.S. GOV'T ACCOUNTABILITY OFF., GAO-06-382SP,
PRINCIPLES OF FEDERAL APPROPRIATIONS LAW (Vol. II
2006)....................................................................................................1

# GLOSSARY

APA:        Administrative Procedure Act

SBA:        Small Business Administration

## JURISDICTIONAL STATEMENT

The district court entered final judgment on July 25, 2022. Concert Investor filed a timely notice of appeal on September 22, 2022. *See* FED. R. APP. P. 4(a)(1)(B). The district court had jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702. This Court has appellate jurisdiction under 28 U.S.C. § 1291.

On December 29, 2022, President Biden signed the Consolidated Appropriations Act of 2023, which included a provision rescinding $459 million of "unobligated" funds for the Shuttered Venue Operators Grant program. Pub. L. No. 117-328, div. MM, § 101, 136 Stat. 4459, 6110 (2022). The government has argued in other cases that this rescission moots claims relating to the Shuttered Venue Operators Grant program. But improperly awarded funds and unspent funds recovered by an agency normally "are to be credited to the appropriation or fund accounts from which the excess payments were made" and "remain available for further obligation within the time and purpose limits of the appropriation." U.S. GOV'T ACCOUNTABILITY OFF., GAO-06-382SP, PRINCIPLES OF FEDERAL APPROPRIATIONS LAW 6-170, 6-174 (Vol. II 2006). The SBA has asserted that it intends to recoup funds that were

improperly awarded under the Shuttered Venue Operators Grant program. JA 747-748. In addition, there remains a live controversy over whether the SBA acted arbitrarily, capriciously, or contrary to law in repeatedly denying Concert Investor's application. Accordingly, the rescission does not render this case moot.

## STATEMENT OF ISSUES

I.  Whether the Small Business Administration's denial of Concert Investor's application for a Shuttered Venue Operators Grant was arbitrary, capricious, and contrary to law because the record demonstrates that Concert Investor's extensive production activities fall within the broad statutory definition of a "live performing arts organization operator."

II. Whether, at a minimum, remand to the agency is required for two independent reasons:

A.  In accepting a definition of the statutory term "produces" that the Small Business Administration did not offer in its decision, the court improperly credited the government's *post hoc* litigation rationale; and

B.    The record does not resolve Concert Investor's claim regarding the Small Business Administration's concededly disparate treatment of similarly situated competitors.

## STATUTES AND REGULATIONS

Applicable statutory provisions and regulatory guidance are contained in the Addendum bound with this brief.

## INTRODUCTION

The COVID-19 pandemic and associated restrictions on public gatherings devastated live performing arts organization operators like Plaintiff Concert Investor LLC.  Before the pandemic, Concert Investor earned millions of dollars by producing, managing, and organizing immersive live concert experiences for some of the biggest bands in the United States, and redistributed those earnings to the network of critical entertainment professionals with which it subcontracts.  In early 2020, that revenue evaporated as Concert Investor (and the many downstream subcontractors who depend on its business) struggled to survive.

Recognizing the importance of a vibrant live entertainment industry to our nation and the unique challenges the industry faced during the pandemic, Congress specifically established a grant program

3

to provide vital assistance to small businesses like Concert Investor through the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act.  The Small Business Administration ("SBA"), however, denied Concert Investor's application.  That determination is unlawful.

The SBA determined that Concert Investor is categorically ineligible for a grant because its "significant responsibilities" purportedly relate only to lighting and sound.  That conclusion is wrong and disregards the record-backed industry understanding of the relevant statutory terms.  Extensive evidence shows that Concert Investor is involved in "each and every element" of tours—indeed, on its most recent tour, "all other firms involved [besides Concert Investor] [we]re subcontractors."  Erroneously relying on its Frequently Asked Questions rather than the statutory terms Congress chose, the agency adopted a cramped view of the statute based on what does *not* qualify for grant funding.  But that negative definition completely fails to provide a coherent understanding of the types of activities *do* qualify.  The agency's *ad hoc* distinctions between Concert Investor and various qualifying agencies also ignore that lighting and sound are integral, not incidental, to Concert Investor's unique shows.

4

The SBA's APA violations compel reversal of judgment for Defendants and entry of judgment for Concert Investor. But at a minimum, remand to the agency is required for two independent reasons. First, although "the SBA had not previously offered *** a definition" of the key statutory term, JA 773, the district court improperly accepted government litigation counsel's newly proffered definition. Second, the record does not resolve Concert Investor's claim regarding the SBA's acknowledged disparate treatment of similarly situated competitors—an action that has left Concert Investor severely disadvantaged compared to those competitors in accessing capital and booking business over two years after it applied for pandemic relief funds. For any and all of those reasons, the district court's judgment in favor of the agency should not stand.

## STATEMENT OF THE CASE

## I.   STATUTORY FRAMEWORK

During the COVID-19 pandemic, the federal government established multiple programs to aid struggling sectors of the American economy. ROBERT JAY DILGER, ET AL., CONG. RSCH. SERV., R46689, SBA

SHUTTERED VENUE OPERATORS GRANT PROGRAM (SVOG) 2 (2022).[1]

Despite being substantially impaired by the pandemic, small businesses in the live entertainment industry often failed to qualify for this assistance. *Id*. at 1-2. By the summer of 2020, a bipartisan effort to address this shortcoming in the preexisting relief programs materialized on Capitol Hill. *Id*. The proposed "Save Our Stages Act" provided targeted assistance to small businesses in the live entertainment industry. *Id*. As Senator John Cornyn explained:

> Unlike restaurants or retailers, which were able to switch to curbside or pickup delivery, event venues don't offer a service that can be tailored to meet the CDC guidelines. *** That leaves no opportunity for live venue operators, promoters, producers, and talent representatives to organize events and no chance for security guards, ticket takers, bartenders, or cleanup crews to earn a paycheck.

166 CONG. REC. S5485-S5486 (daily ed. Sept. 9, 2020) (statement of Sen. John Cornyn). Congress ultimately passed the Save Our Stages Act as part of the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act, which was signed into law on December 27, 2020. Pub. L. No. 116-260, § 324, 134 Stat. 1182, 2022-2032 (2020).

---

[1] https://crsreports.congress.gov/product/pdf/R/R46689.

The Act established and appropriated $15 billion to the Shuttered Venue Operators Grant program.  Pub. L. No. 116-260, § 323(d)(1)(H), 134 Stat. at 2021.  The American Rescue Plan, enacted March 11, 2021, appropriated an additional $1,249,500,000 for awards.  Pub. L. No. 117-2, § 5005, 135 Stat. 4, 91 (2021).  The grant program is administered by the SBA and "provides emergency assistance *** to support the ongoing operations" of certain small businesses in the live entertainment industry "during the uncertain economic conditions caused by the COVID-19 pandemic."  SBA, *About SVOG*.[2]  An eligible entity that suffered at least a 25% reduction of gross revenue in 2020 may receive an award in an amount equal to 45% of its gross revenue in 2019.  15 U.S.C. § 9009a(a)(1)(A)(i)(II), (c).  A business with 2021 first quarter revenue of no more than 30% of its 2019 first quarter revenue is eligible for a supplemental grant of 50% of the original award amount.  *Id.* § 9009a(b)(3)(A);  Press Release (No. 21-75), SBA, *SBA Opens*

---

[2]    https://www.sba.gov/funding-programs/loans/covid-19-relief-options/shuttered-venue-operators-grant/about-svog.

*Supplemental Grant Applications for Shuttered Venue Operators Grant Awardees* (Aug. 27, 2021).[3]

To be eligible for a grant, a business must fall within one of the Act's enumerated categories, which include "live performing arts organization operator[s]," along with theatrical producers, live venue operators and promoters, museum operators, motion picture theatre operators, and talent representatives. 15 U.S.C. § 9009a(a)(1)(A). As relevant to this appeal, the Act defines a "live performing arts organization operator" to mean:

> an individual or entity *** that, as a principal business activity, organizes, promotes, produces, manages, or hosts live concerts, comedy shows, theatrical productions, or other events by performing artists for which *** a cover charge through ticketing or front door entrance fee is applied[.]

*Id.* § 9009a(a)(3)(A)(i)(I). In addition to that baseline requirement, the statute imposes additional criteria (not disputed here). For example, an individual or entity must generate at least 70% of its earned revenue through "production fees or production reimbursements" or other listed sources. *Id.* § 9009a(a)(3)(A)(i)(II). And the relevant events must take

---

[3] https://www.sba.gov/article/2021/aug/27/sba-opens-supplemental-grant-applications-shuttered-venue-operators-grant-awardees.

place at venues that have a defined performance and audience space; use mixing equipment, a public address system and a lighting rig; and engage one or more individuals to carry out at least two of the following roles: sound engineer, booker, promoter, stage manager, security personnel, or box office manager. *Id.* § 9009a(a)(1)(A)(iii).

## II.    FACTUAL BACKGROUND

### A.    Concert Investor's Business

Concert Investor is a small business based out of Nashville, Tennessee, that produces, organizes, and manages concerts and concert tours for performing artists. *See, e.g.*, JA 572-575; JA 355. The Company has carried out these functions for some of the biggest artists in the country, including twenty øne piløts, a Grammy-award-winning band whose hit single, "Stressed Out," has been viewed over 2.6 *billion* times on YouTube.[4] Other artists for whom Concert Investor has produced shows include Little Big Town, O.A.R., Judah & The Lion, iPrevail, and The Band Camino. JA 639.

---

[4] Stressed Out, https://www.youtube.com/watch?v=pXRviuL6vMY; *see also* Heathens, https://www.youtube.com/watch?v=UprcpdwuwCg (1.9 billion views); Ride, https://www.youtube.com/watch?v=Pw-0pbY9JeU (1.3 billion views).

Once engaged by an artist, Concert Investor produces, organizes, and manages tour shows by creating the content of the performances, engaging and overseeing independent contractors and vendors to staff the tour, managing the budget and financing for the shows, procuring and managing the necessary equipment, and coordinating logistics. JA 572-573, 658, 671.[5] Concert Investor also advances tour costs to secure vendors and independent contractors, and receives "production fees" and "production reimbursements" for its work. JA 639; JA 252-313 (invoices for "production reimbursement" billed to twenty øne piløts, Little Big Town, Judah & the Lion, iPrevail, and O.A.R.).

## B.    The Banditø Tøur

Concert Investor's activities for twenty øne piløts's international Banditø Tøur, which represented the bulk of the company's work in 2018 and 2019, illustrate the range of concert production, organization, and

---

[5] The link in the administrative record to the full version of the article excerpted at JA 671 is no longer functional. The full version of the article is available at https://mydigitalpublication.com/publication/?m=19394&i=557788&p=36&ver=html5. Citations in this brief to the relevant page of the administrative record, JA 671, are intended to encompass citations to the underlying full version of the article.

management functions Concert Investor carries out. *See* JA 573. Under the agreement with twenty øne piløts, the band retained Concert Investor as Producer to carry out a range of services for the Banditø Tour. JA 611; *see also* JA 689 (2019 contract with venue operator Live Nation documenting Concert Investor's role providing production services).

Concert Investor's planning and design of the two-year tour kicked-off "14 months before the tour started." JA 661. Concert Investor conceived of "107 pages of creative elements," most of which were ultimately featured in the tour. JA 658. Examples include a Plexiglas bridge that spanned two stages and a 1991 Cadillac Deville that was engulfed in flames during each show. JA 658-659, 662, 671. Concert Investor also programmed "up to 1,000 lighting cues per song" and "video content playback," "perfectly align[ing] them with the audio waveforms in the track." JA 661, 671. Concert Investor's schematic diagrams detail the staging, engineering, lighting, video, special effects, and other features of the Banditø Tour. JA 576-610. That work gave life to themes, stories, symbols, and other immersive components of the shows, including its "most stunning moments." JA 662; *see also* JA 659-661.

11

In addition to design and programming for the Banditø Tour, Concert Investor managed and organized "vendor selection," "coordination," and "hiring touring personnel." JA 658. Concert Investor retained vendors and personnel for many critical services and roles, including: stage managing, JA 678; graphic design, JA 688; staging, JA 642; power generation and distribution, JA 655; the Audio Package, LED package, Lighting Package, Screen Media Server Package, Rigging Package, and Engineering Services, JA 643-644; sound engineering, JA 677; lighting technicians and crew, JA 679-680, 682; rigging services, JA 683; video and software services, JA 684-687; video crew and equipment, JA 651; and special effects (including lasers, smoke generators and machines, custom-cut confetti, and pyrotechnical effects), JA 649, 658-664. To ensure all those firms worked seamlessly on the road, Concert Investor participated in rehearsals. JA 369, 659. Aside from Concert Investor, "all other firms involved [we]re subcontractors." JA 658.

Concert Investor also organized and managed the tour's budget and finances. JA 658 ("Concert Investor *** manages the production budget"); JA 639 (Concert Investor advances costs for the tour, which are later repaid by the band after ticket sales); JA 674-676 (ledger depicting

payments to tour personnel and vendors); JA 252-313 (invoices for production reimbursement); JA 315-354 (bank statements showing payments to vendors and personnel as well as payments from clients, *e.g.*, "PROD" payments from "TOP LLC" (twenty øne piløts)). That budget included weekly costs for audio, video, lighting, media servers, rigging, labor, special effects, power, staging, and payments to independent contractors. JA 369-385. It also included expenses paid by Concert Investor to ensure seamless management of the tour as issues arose. *See* JA 658. These costs included resolving broken gear, reprogramming the show to accommodate a creative change by the band, and even chartering a Boeing 747 to transport the entire show from Auckland to London and shipping containers from Australia to Los Angeles. JA 404, 410, 413. Concert Investor also managed the payroll for tour staff, JA 315-354, and took out a workers' compensation and employers' liability insurance policy for the tour, JA 525-559.

Additionally, Concert Investor procured and insured the production equipment and hired and managed subcontractors to provide all equipment-related services, from installation and assembly to maintenance and operation. JA 611; *see also* JA 614, 617. And once the

13

equipment was secured, Concert Investor "manage[d] the gear assets such as audio, lighting, LED, projection, cameras, automation, rigging, custom set pieces, special effects; lasers, cryo, pyro, confetti, as well as motion graphics, crewing, and shipping occasionally like air freighting the production between continents."  JA 671.

Two concert industry magazines showcased Concert Investor's expansive work producing, managing, and organizing the Banditø Tour in January 2019 cover stories.  *Lighting & Sound America* explained that Concert Investor "produce[d] the tour's live elements, help[ed] with TV moments, manage[d] the production budget, production design, programming, vendor selection, and coordination, and deal[t] with hiring touring personnel[.]"  JA 658.  *Projection, Lights, and Staging News* similarly described Concert Investor as "a production agency" responsible for "putting it all together" for the tour.  JA 671.  The codesigner of twenty øne piløts' tour told that magazine Concert Investor "did everything you could ask of a production company and more."  JA 658.

All told, the tour spanned 74 shows and sold more than 900,000 tickets.  JA 628.  Concert Investor earned millions in "production fees"

for its work, which amounted to a substantial percentage of the tour's $63 million in overall revenue.  JA 573, 628-635.

### C.    The COVID-19 Pandemic

Beginning in spring 2020, COVID-19 pandemic restrictions across the country decimated demand for live entertainment events.  JA 573; *see generally* JA 23-27 ¶¶ 6-20.  Concert Investor's revenue in 2020 fell 94% from 2019.  JA 237-239.  Attempting to stay afloat, Concert Investor depleted its cash reserves, and its owners spent a substantial amount of their personal savings to cover administrative, insurance, and talent development expenses.  JA 573.  Despite these steps, Concert Investor was unable to compete in an industry that requires production companies to advance large sums of capital for up-front expenditures and deposits necessary to produce a concert.  *Id.*  Concert Investor tried to survive by producing small local events, but its efforts to remain profitable failed. *Id.*

## III.    PROCEDURAL HISTORY

In April 2021, Concert Investor applied for a Shuttered Venue Operators Grant in the amount of $4,988,317.35, which was 44.6% of its

2019 revenue.  JA 233-234.[6]  In July 2021, Concert Investor learned from the SBA's online portal that its application was denied (without explanation).  JA 23 ¶ 7.  Concert Investor submitted an administrative appeal in August 2021, and changed its eligibility category from theatrical producer to live performing arts organization operator, as permitted by the SBA's procedures, to better reflect its business.  JA 23-25 ¶¶ 7-10; JA 249-250.  Less than two weeks later, Concert Investor received a boilerplate appeal denial (with an incomplete subject line containing a placeholder for the applicant's name).  JA 31.  The letter stated, without any further reasoning, that Concert Investor's application remained denied.  *Id.*  The SBA subsequently notified Concert Investor that it would re-evaluate the decision, but sent yet another denial in early November 2021.  JA 251.  Instead of providing an

---

[6] $4,988,317.35 is Concert Investor's Adjusted Proposed Grant Amount.  JA 234.  (Due to a transcription error, Concert Investor's Second Amended Complaint misstates the figure as $4,946,650.35.)  This request reflects "the amount equal to 45% of the gross earned revenue of [Concert Investor] during 2019, 15 U.S.C. § 9009a(c)(1)(A)(i), less "the total amount of loans guaranteed" under the Paycheck Protection Program that Concert Investor received, *id.* § 9009a(c)(1)(C); *see* JA 234.  In addition to this requested amount, Concert Investor is eligible for a supplemental grant "in the amount equal to 50 percent" of the original award amount.  15 U.S.C. § 9009a(c)(2); *see* JA 56.

explanation, the SBA checked boxes indicating that Concert Investor "[d]id not meet the principal business activity standard for the entity type under which [it had] applied" and "[d]id not meet one or more of the eligibility criteria specific to the entity type under which [it had] applied." *Id.*

On December 1, 2021, Concert Investor filed this action in district court seeking judicial review of the SBA's denial under the Administrative Procedure Act ("APA"). JA 11. In response to the suit, the SBA initially rescinded its denial. Defs.' Mot. For Stay 2, ECF No. 12. But upon reconsideration, it subsequently issued a final denial on March 23, 2022. JA 106-110.

The SBA found that Concert Investor "design[s] the plots" for performances, "obtain[s] subcontractors to install *** necessary equipment" for shows, and "obtain[s] subcontractors to *** operate the necessary equipment during a concert." JA 108. But the agency determined that those functions were "insufficient to meet the definition of a performing arts organization operator." *Id.* Relying largely on language from its own "frequently asked questions" rather than the statutory text, the SBA found that Concert Investor "does not create,

17

perform, or present live performances," does not "organize or host live concerts," and is not a "producer," but instead "serves the needs of touring concert artists for lighting and sound[.]" *Id.* The SBA acknowledged that it had given Shuttered Venue Operators Grants to three similarly situated entities, but stated that it was "reevaluating" those grants. JA 110. It also purported to distinguish four entities that had received grants based on a "range of services," such as "costuming" and dance "choreography," while noting that Concert Investor "is involved solely with lighting and sound." JA 109-110.

The parties filed cross-motions for summary judgment, raising "competing understandings of what entities are eligible for the SVOG Program," JA 772, as well as whether the SBA "ignore[d] relevant evidence" and drew conclusions that are "counter to the evidence," JA 776, and provided "disparate treatment" to similarly situated competitors, JA 782-783. After briefing was complete, but before the district court ruled on the parties' motions, the SBA informed the court that it had determined that the three "reevaluat[ed]" competitors were improperly awarded grants and had been referred "for inclusion in the

Agency's process to recover repayment of improper awards," which was "still under development."  JA 741-748.

The district court denied Concert Investor's motion for summary judgment, granted Defendants' cross-motion, and entered judgment for Defendants.  JA 769.  The court focused its analysis on "what it means to be an entity that 'produces *** live concerts.'"  JA 772-773 (ellipsis in original) (quoting 15 U.S.C. § 9009a(a)(3)(A)(i)(I)).  Although "[t]he appropriate definition of 'produces' is not a simple interpretive question," the court ultimately embraced litigation counsel's dictionary-based argument, articulated for the first time in litigation, that the Act requires "ultimate control over all aspects of a show"—*i.e.*, a "full service producer."  JA 774, 777.  "[W]hile the agency did not directly articulate this reasoning" in the decision under review, the district court held that litigation counsel's proffered definition was a permissible "amplified articulation" of the SBA Decision, rather than an impermissible "*post hoc* justification."  JA 774-775.

Under that definition, the district court agreed with the government that "Concert Investor is responsible for the light and sound aspects of musical tours and thus is not a producer[.]"  JA 778.  Although

19

"the evidence indicates Concert Investor had significant responsibilities" for the shows—including "contract[ing] with vendors" and handling "responsib[ility] for some designs, equipment, logistics, occasional transportation, and more," JA 779—the district court held that the record does not "displace[] or seriously question[] the SBA's conclusions that Concert Investor's principal business activity is limited to lighting and sound," JA 781. Thus, the court agreed with the agency that Concert Investor is not a "full service producer." JA 777, 779-781.

Lastly, the district court determined that the SBA did not act arbitrarily and capriciously "by denying [Concert Investor's] application but granting the applications of seven competitors." JA 782. The court held that "the SBA provided reasonable explanations" for treating four competitors differently. JA 784. "Regarding the three similar entities" awarded grants that the SBA declined to distinguish, the court held that "[t]he agency need not do more" than "conclude[] that rescission [of those awards] is appropriate and *** refer[] the three similar companies to a program to recoup the improperly awarded funds." JA 783.

20

## SUMMARY OF ARGUMENT

**I.**      This Court should reverse the district court's judgment for Defendants because the SBA's Decision is arbitrary, capricious, and contrary to law.

Despite a mountain of evidence demonstrating that at least one of Concert Investor's principal business activities is to produce, organize, or manage live concerts—and that all the other statutory criteria are met—the SBA denied Concert Investor's application.  In doing so, the SBA applied a definition of a "Live Performing Arts Organization Operator" that is divorced from the Act and the record.  Largely relying on the definition section of its own unpublished regulatory guidance, the agency adopted an unduly restrictive interpretation of the key statutory terms. The SBA then proceeded to ignore large swaths of critical record materials showing that Concert Investor's functions stretched far beyond the critical sound and light aspects of its shows.  As the evidence regarding the Banditø Tour illustrates, Concert Investor "put[] it all together" so that "each and every element" of the series of shows ran smoothly.  JA 573, 671.  But the SBA examined only (parts of) four isolated documents that are not representative of the overall record.

21

Even as to those materials, the SBA failed to provide a reasoned explanation for its Decision because the documents establish, rather than undermine, Concert Investor's broad production responsibilities.

In any event, Concert Investor undisputedly "had significant responsibilities" for live tours, including at a minimum "total responsibility for the lighting and sound." Yet the SBA Decision inexplicably deemed those critical functions inadequate to meet the statutory definition, while simultaneously making *ad hoc* determinations that various services provided by competitors do qualify. That determination is not only arbitrary, but disregards the unique lighting- and sound-intensive nature of the shows Concert Investor produces, organizes, and manages.

**II.** At a minimum, remand to the agency is required for two independent reasons.

First, the district court's decision granting summary judgment to the SBA rests improperly on a *post hoc* rationale. Despite the interpretive complexity of defining the statutory term "produces," the district court accepted a made-for-litigation definition that "the SBA had

not previously offered." JA 773.  Under fundamental administrative law principles, that belated definition could not sustain the agency's action.

Second, the administrative record did not resolve whether the SBA actually rescinded funds it acknowledges were awarded to similarly situated competitors.  The district court thus erred in granting summary judgment to the agency based on evidence beyond—and created after compilation of—the administrative record.  Moreover, especially because the SBA's differential treatment of Concert Investor placed it a distinct disadvantage compared to its competitors, the SBA should have been tasked with resolving the discrepancy in the first instance.  That unresolved issue—which continues to harm Concert Investor to this day—precludes summary judgment in favor of Defendants on Concert Investor's disparate treatment claim.

## STANDARD OF REVIEW

This Court reviews the district court's grant of summary judgment *de novo*.  *See Ark Initiative v. Tidwell*, 816 F.3d 119, 126-127 (D.C. Cir. 2016).  "In a case like the instant one, in which the District Court reviewed an agency action under the" APA, this Court "review[s] the administrative action directly" and "accord[s] no particular deference to

the judgment of the District Court." *Associated Builders & Contractors, Inc. v. Herman*, 166 F.3d 1248, 1254 (D.C. Cir. 1999).  Thus, this Court's "task is the same as that performed by the district judge," *i.e.*, to "review the administrative record to determine whether the agency's decision was arbitrary and capricious, and whether its findings were based on substantial evidence." *Forsyth Mem'l Hosp., Inc. v. Sebelius*, 639 F.3d 534, 537 (D.C. Cir. 2011).

## ARGUMENT

### I. THE SBA ACTED ARBITRARILY, CAPRICIOUSLY, AND CONTRARY TO LAW IN DENYING CONCERT INVESTOR'S GRANT APPLICATION.

The record establishes that at least one of Concert Investor's principal business activities is to produce, organize, or manage live concerts, making it a "live performing arts organization operator" as Congress defined that term.  In concluding otherwise, the SBA acted arbitrarily, capriciously, and contrary to law, by both applying an unduly narrow—and nonstatutory—definition of a "live performing arts organization operator," and then by ignoring crucial record evidence. Indeed, Concert Investor should have been awarded a grant even under the SBA's overly narrow conception of eligibility.  The district court's

24

decision should be reversed and judgment should be entered for Concert Investor.

## A. Concert Investor Produces, Organizes, And Manages Live Concerts

As relevant here, Congress broadly defined a "live performing arts organization operator" to encompass any entity that, as a "principal business activity, *organizes, promotes, produces, manages, or hosts* live concerts" in qualifying venues.  15 U.S.C. § 9009a(a)(3)(A)(i)(I) (defining "live venue operator or promoter, theatrical producer, or live performing arts organization operator").  Under that flexible definition, an entity need principally perform only one of those activities to be eligible for funding.  Because the Act does not otherwise define those activities, it is reasonable to assume that "Congress intended for th[eir] definition[s] to be developed by the agency in a manner that is consistent with the customary usage of the phrase[s] in the [relevant] industry," *Association of Am. R.Rs. v. Costle*, 562 F.2d 1310, 1319-1321 (D.C. Cir. 1977)—here, the live entertainment industry.

The record before the agency demonstrates that Concert Investor has long been understood by the concert industry as a company that engages in (and excels at) "produc[ing]," "organiz[ing]," and "manag[ing]"

25

live concerts.  15 U.S.C. § 9009a(a)(3)(A)(i)(I).  As explained in Concert

Investor's sworn application to the SBA, the company's "unwavering

mission has been to design and produce the most dynamic, efficient, and

innovative concert productions for some of the world's most talented and

recognized artists."   JA 572.   As "architects and orchestrators of

individual musical tours," the company invests its owners' "collective

time and talents" to "design, negotiate, hire, program and insure each

and every element of the tour" through a network of subcontractors.  JA

572-573.  "100% of [Concert Investor's] revenue [is] generated from

production fees that [a]re charged to artists."  JA 573.  The company

attested to the veracity of its representations "under penalty of perjury."

JA 249 (capitalization omitted).

Relevant   industry   participants   share   Concert   Investor's

understanding of its principal business activities.  For example, trade

magazines focused on the live entertainment sector describe Concert

Investor as a "production agency" responsible for "putting it all together"

for a series of live concerts by "manag[ing] the tour's production budget,

production design, programming, vendor selection, and coordination as

well as hiring the touring personnel."  JA 671 (emphasis added); *see* JA

658.  The codesigner of twenty øne piløts' Banditø Tour explained that Concert Investor "did everything you could ask of a production company and more."  JA 658.  Contractual agreements consistently describe Concert Investor as a Producer responsible for providing production services for the concert tours.  *See, e.g.*, JA 689 (Live Nation affiliate contract); JA 611 (touring agreement).  Artists pay Concert Investor's invoices for "production reimbursement."  JA 252-313; *see also* JA 318, 322, 328, 329.  Show credits regularly list Concert Investor's owners as "Executive Producer," "Production Designer," and/or "Line Producer."  JA 672, 673.  And Concert Investor's Nashville-based certified public accountant, who specializes in entertainment industry accounting (and who operates under strict ethical requirements for professional (CPA) licensure), affirmed that the company is "in the business of producing live concert events on an international scale in venues ranging from small music clubs to arenas."  JA 355.

In short, the undisputed record evidence before the SBA—including articles, invoices, and other evidence relied on by members of the industry—shows that at least one of Concert Investor's "principal business activit[ies]" is to "organize[], promote[], produce[], manage[], or

27

host[] live concerts."  15 U.S.C. § 9009a(a)(3)(A)(i)(I).  The SBA neither submitted nor relied on any contrary evidence to refute that record-based showing.  And because the SBA did not deny that every other statutory element was met (including that Concert Investor operated and planned to operate during the requisite dates, suffered the requisite reduction in revenue, and produced shows at venues with the requisite characteristics), Concert Investor's application for funding should have been granted.

**B.     The SBA Erroneously Concluded That Concert Investor Is Not A Live Performing Arts Organization Operator**

Under Congress's broad statutory definition—and given Concert Investor's equally broad responsibilities for live concert tours—this should have been an easy case.  In nonetheless denying Concert Investor's application, the agency erred legally and factually.  It first applied an unduly restrictive (and atextual) definition of a "live performing arts organization operator."  Armed with its narrow definition, it then ignored and misconstrued record evidence demonstrating that Concert Investor plainly qualified for a grant under any reasonable definition.

**1.** As a threshold matter, the agency failed to apply the statutory definition of "live performing arts organization operator" chosen by Congress. Instead, the agency looked to the "definition section of its frequently asked questions." JA 106. But that subregulatory guidance document, which was not promulgated through notice and comment rulemaking, inexplicably substitutes three of Congress's chosen terms ("organize[]," "host[]," and "manage[]") with different, nonstatutory language ("create," "present," and "perform") in defining "live performing arts organization operator":

> any entity (including a theatrical management business) whose principal business activity is to *create, produce, perform, and/or present* live performances for audiences in qualifying venues, including amphitheaters, concert halls, auditoriums, theatres, clubs, festivals, and schools.

JA 106 (quoting JA 735) (emphasis added); *cf.* 15 U.S.C. § 9009a(a)(3)(A) ("organizes, promotes, produces, manages, or hosts").

As a result of that error, the SBA never considered whether Concert Investor carries out several of Congress's principal business activities, such as "manag[ing]" or "promot[ing]" live concerts, that would qualify under the Act. 15 U.S.C. § 9009a(a)(3)(A)(i). That error also led the SBA to confusingly find that "Concert Investor does not create, perform, or

present live performances—its clients/artists do." JA 108. But no one disputes that "artists and entertainers"—not "live performing arts organization operators"—actually "perform[]" the live performances within the meaning of the Act. 15 U.S.C. § 9009a(a)(3)(A)(i); *see id.* § 9009a(a)(1)(A)(iii) (distinguishing between "the artists and entertainers represented or managed by the talent representative[s] [who] perform" in the events and those who operate the events). Whether Concert Investor itself "performs" live shows, or "creates" or "presents" them, is irrelevant under the statute.

Although the SBA eventually turned to the key term "produce" (*i.e.*, the only term appearing in both the "frequently asked questions" and the statute), the SBA undisputedly failed to offer an affirmative definition. *See* JA 773 (acknowledging that the SBA failed to "expressly state such a definition"). Again relying on its "frequently asked questions," the SBA instead defined the term negatively, by holding that "producer" did *not* include "service providers that support eligible entities." JA 108-109 (quoting JA 698). But the statute does not say that. And even if it did, the agency acknowledged that "subcontractors" supervised by Concert Investor actually provide the technical services, like "install[ing] and

30

operat[ing] the necessary equipment during a concert," for the tours in which Concert Investor is involved.   JA 108; *see* JA 658 (magazine explaining that, besides Concert Investor, "all other firms involved [we]re subcontractors").   The agency's own conclusion that Concert Investor "contracts with [these] third part[y]" service providers, JA 108, shows that Concert Investor itself is not a provider of services for another eligible entity.[7]

The SBA also purported to distinguish Concert Investor's range of activities from the activities of entities deemed eligible for grants.   But the agency's distinctions provide no coherent view of the "range of services" that qualify an entity to be a "production company."   JA 109-110.   One qualifying company offers "trucking, storage, load-in, and staffing" services, but only "technical supervision to the artistic and

---

[7] The SBA also mentioned in passing that Concert Investor "does not organize *** live concerts" supposedly because, "[a]ccording to [Concert Investor's] August 13, 2021 letter, a different entity is responsible for that function."   JA 107-108.   But nothing in the statute suggests that a concert can have only one entity tasked with "organiz[ing]" the show.   In any event, the conclusion is wrong:  the letter does not even mention the word "organize" and instead was submitted to satisfy the statutory requirement that venues have certain technical staff.   15 U.S.C. § 9009a(a)(1)(A)(iii); *see* JA 107-108 (describing characteristics of "every venue that Concert Investor operated in").

creative teams." JA 110 (discussing Blackbird Production Partners, LLC). In contrast, a different qualifying company does not provide transportation, storage, or staffing, but does focus on "provid[ing] original content, music composition and arrangement, [and] creative development." JA 109 (discussing Matt Davenport Productions). The SBA did not even try to offer a coherent basis for why those disparate groups of functions are integral to "producing" a concert, while the acknowledged functions performed by Concert Investor—"serv[ing] the needs of touring concert artists for lighting and sound, designing the plots and obtaining subcontractors to install and operate the necessary equipment"—are insufficient. JA 108.

**2.** Armed with its narrowed definition, the SBA then proceeded to ignore key pieces of the record—and to misconstrue the rest. Most notably, the SBA ignored industry articles expressly refuting the agency's conclusion that Concert Investor was a mere "service provider" for lighting and sound. One feature story described Concert Investor's role as "Putting It All Together" for live concerts, JA 671, while another quotes twenty øne piløts' explanation that Concert Investor does "everything you could ask of a production company and more." JA 658.

32

Those articles confirm that, beyond handling lighting and sound for performances, Concert Investor "produces the tour's live elements, helps with TV moments, manages the production budget, production design, programming, vendor selection, and coordination," "deals with hiring touring personnel," and "broker[s]" the production.   JA 658; *see id.* (explaining Concert Investor began working on production for Banditø Tour 14 months in advance).  The articles explain that Concert Investor creates and operates "custom set pieces"; oversees unique show features such as "special effects," "cryo," and "pyro"; manages "crewing," and coordinates "air freighting the production between continents."  JA 671. The articles reiterate that Concert Investor does not directly provide technical services, but relies on "[k]ey partnerships with [a] close knit group of vendors."   JA 658.   Indeed, "all other firms involved are subcontractors."  *Id.*

The articles further recount that part of the company's critical role is to resolve *any* concern that may arise with respect to *any* aspect of the tour:  "When you approach Concert Investor with a problem or an issue, they provide you with a solution, no matter the difficulty."  JA 671; *see* JA 658.  Thus, twenty øne piløts turned to Concert Investor when the

33

band needed to resolve broken gear, reprogram a part of the show to accommodate a creative change, or even charter a Boeing 747 to transport the entire production from Auckland to London. JA 404, 410, 413 (invoices reflecting activities).

The SBA's Decision is also bereft of any discussion of other pertinent record materials corroborating the magazines' account of Concert Investor's multifaceted responsibilities, including:

- managing the tour's *overall* budget and advancing production costs, as evidenced by a record of the budget itself, JA 369-385, plus invoices for "production reimbursement," bank statements, Concert Investor's April 2021 letter to the SBA, and a master ledger for the Banditø tour, *see* JA 252-313, 315-354, 639, 674-676;

- retaining, supervising, and organizing vendors and staff for aspects of the concert unrelated to or going beyond lighting and sound such as stage management, graphic design, video and software services, power generation and distribution, and special effects (including non-lighting effects like confetti) as evidenced by invoices, JA 655, 678, 684-688 (invoices for power generation and distribution, stage managers, video directors, and content creator);

- set construction, as evidenced by schematic diagrams, *see* JA 576-610; and

- payroll and insurance for tour staff, as evidenced by bank wires and insurance policies, *see* JA 315-354, 525-559.

34

The SBA also misconstrued the limited evidence it did consider. The SBA confined its discussion of the record to just four materials, but none limits Concert Investor's activities to the lighting and sound elements of concerts.  For example, the SBA read the red-line copy of Concert Investor's agreement with twenty-øne piløts to say that "Twenty-øne piløts was responsible for the transportation of the equipment and personnel retained by Concert Investor as well as the lodging of and per diem rates for the personnel."  JA 107 (discussing JA 611-626).  But the agency never explained why those functions would affect the qualifying status of a producer under the Act (let alone why they would confine Concert Investor's role to lighting and sound).

To take another example, the August 11 letter discussed the scope of the activities Concert Investor undertook to "produce" concerts, including "spen[ding] thousands of hours over the course of 18 months to design, negotiate, hire, program, and insure *each and every element*" of the Banditø Tour alone.  JA 573 (emphasis added); *see, e.g.*, JA 572 ("Our company procures and maintains the Workers Compensation Insurance and General Liability Insurance *for all the production elements* and associated labor for each production or tour." (emphasis added)). The

owners explain that in their prior role as venue owners and operators, they built "partnerships with industry professionals that *included* audio, lighting, video and special effects vendors and technicians," which Concert Investor "then leveraged *** to become an effective and competitive producer" handling "the *entire* production" for each tour. JA 573 (emphases added).

Similarly, the SBA reviewed "several invoices" for "production reimbursement" which did not indicate that Concert Investor "provided any services beyond those connected with light and sound." JA 108 n.1. But additional invoices in the record expressly reference additional services, like those relating to special effects, camera and video, and stage management. *See* JA 649, 651, 678. More generally, invoices for "production reimbursement" do not *exclude* additional activities; they simply reflect industry participants' understanding that Concert Investor "produces" shows. JA 252-313. The sheer amount Concert Investor earned for the Banditø Tour—millions of dollars, representing a substantial percentage of the more than $63 million in total revenue the tour generated, JA 573, 628-635—undermines the SBA's cabined view of Concert Investor's "limited" role. JA 109.

36

The SBA's failure to acknowledge, let alone grapple with, much of the record evidence—and its superficial review of the rest—was arbitrary and capricious and not supported by substantial evidence. *See AT&T Corp. v. FCC*, 86 F.3d 242, 247 (D.C. Cir. 1996) (substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," taking into account "whatever in the record fairly detracts from its weight"). "[B]ecause the agency decisionmaker entirely ignored relevant evidence," the SBA's decision cannot "withstand review." *Morall v. DEA*, 412 F.3d 165, 178 (D.C. Cir. 2005) (emphasis omitted).

**3.** Although the district court acknowledged that the SBA "fail[ed] to cite or expressly analyze" certain "evidence in its written opinion," the court found that "the arc of the agency's reasoning is readily discernible." JA 781. Relying on *Bowman Transportation, Incorporated v. Arkansas-Best Freight System, Incorporated*, 419 U.S. 281, 286 (1974), the court stated that an agency need only "engage with as much evidence as necessary such that its logic can reasonably be discerned." JA 777. But that principle concerns the agency's actual "treatment of [certain] evidence." 419 U.S. at 290; *see id.* at 289-292 (reviewing agency's reasons

37

for "attribut[ing] little significance" to specific category of evidence).  The agency here did not "acknowledge[] the [relevant materials] but conclude[] that they offered an inadequate rebuttal," *id.* at 286; rather, it overlooked critical evidence, which therefore did not factor into the agency's decisionmaking at all.  Even if the SBA's reasoning were clear, that would not excuse "ignoring" record evidence "that is at odds with its conclusion." *Genuine Parts Co. v. EPA*, 890 F.3d 304, 313 (D.C. Cir. 2018) (formatting altered).

The district court also surmised that "the SBA actually considered all of the record evidence"—even though the agency only "provided a written analysis as to some"—because the four pieces of evidence the Decision references were purportedly "representative" of the other materials in the record.  JA 778.  Not so:  there were whole categories of other evidence—including industry articles, the letter from Concert Investor's accountant, venue contracts, Concert Investor's operating agreement, workers' compensation agreements, and the overall tour budget that Concert Investor managed—that went unmentioned.

Ultimately, the district court tried to overcome the Decision's obvious shortcoming by simply analyzing the evidence for the first time

itself—but even then, it misconstrued the record. For example, when offering an analysis of the magazine articles the SBA ignored, the court emphasized their mention of lighting- and sound-related tasks. *See* JA 780. It should be no surprise that magazines called *Lighting and Sound America* and *Projection, Lights, and Staging News* were especially interested in those aspects of the lighting-and-sound-intensive shows. But the magazines nevertheless highlighted additional tasks that the district court's opinion omits, such as "managing the tour's production budget, production design, \*\*\* and programming," not to mention constructing the set and advancing costs. *See* JA 658.

The district court also minimized the various record characterizations of Concert Investor as "producer," stating that those descriptions are "conclusory." JA 780. But the question the court was purporting to answer was whether Concert Investor "produces" live concerts. The fact that Concert Investor's certified public accountant told the SBA that "Concert Investor is solely engaged in the business of producing live concert events," JA 355—which was consistent with marked-up contracts with prominent industry player Live Nation and others (JA 611, 689), industry articles (JA 658, 671), and several other

documents in the record—was highly probative, not "conclusory," JA 780; *see* JA 355 (Nashville-based accountant "has handled the day to day accounting and business management services for Concert Investor since January 2019").[8]

Regardless, even had the district court analyzed the evidence accurately, the court cannot "make up for such deficiencies" in the agency's analysis by evaluating key evidence that the SBA neglected. *See Delaware Riverkeeper Network v. FERC*, 753 F.3d 1304, 1313 (D.C. Cir. 2014) ("We may not supply a reasoned basis for the agency's action that the agency has not itself given" (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983))).

\*\*\*

Properly construed, the record demonstrates that Concert Investor produces, organizes, and manages live concert tours—or, at the very least, is not "involved *solely* with lighting and sound." JA 110 (emphasis

---

[8] The SBA's own guidance encouraged applicants administratively appealing grant denials to submit letters from their accountants as additional evidence that could "help applicants successfully advance through the review process." JA 730 (¶ 231(D)); *see Edison Elec. Inst. v. EPA*, 391 F.3d 1267, 169 (D.C. Cir. 2004) (agency must "adequately account[] for any departures" from guidance).

added).   Even under the Decision's own terms, Concert Investor was entitled to summary judgment.

## C.    The Government's Arguments Are Unpersuasive

Rather than defend the agency's reliance on the definition from its "frequently asked questions," government litigation counsel attempted to "clarif[y]"—*i.e.*, backfill—a definition of the key term "produces" for the first time before the district court.  JA 775 (focusing on "the government's clarification of the term 'producer' in its briefs").  Counsel argued that the agency properly denied Concert Investor's application not because it was a mere "service provider for lighting and sound," JA 108, but rather because it was not a "*full service* producer," *i.e.*, "the entity 'ultimately responsible for *essentially all aspects* of putting together a concert,'" JA 777 (emphasis added) (quoting Defs' Cross-Mot. for S.J. 5, JA 142).  But that definition—in addition to being hopelessly *post hoc, see* pp. 52-55, *infra*—conflicts with the industry understanding of the term, its commonsense meaning, fundamental rules of statutory construction, and congressional intent.

*First*, although "[i]t is clear that some in the industry use the word ['produces'] flexibly, including many who apply it to entities like Concert

41

Investor," the district court instead prioritized the supposedly "ordinary meaning of the term" gleaned from the government's generic dictionary citations. JA 774. But where Congress has not "specif[ied] in detail phrases that have an established meaning within a particular industry," the "definitions are best developed with reference to the actual context of the regulated industry in question." *Costle*, 562 F.2d at 1319-1320; *see id.* at 1321 (holding that "the Administrator construed the term 'equipment and facilities' in a narrow and artificial manner" that is not "consistent with the customary usage of the phrase in the railroad industry," and remanding to the agency with instructions "that the realities of the railroad industry must govern the definition, not the predilections of the agency as to what it is prepared to regulate"). Here, the "actual context" that is relevant is the uncontroverted record evidence—*e.g.*, "articles in industry magazines, statements by people in the industry, and various contracts"—"show[ing] that Concert Investor is often called a 'producer' and is responsible for what some call the 'production' elements of live performances." JA 773. As the district court recognized, the record demonstrates that the *industry* employs "multiple

senses of the word 'production' or 'produce'"—yet "the agency plainly did not use the flexible definition." JA 779.[9]

*Second*, the government's dictionary definitions do not mandate "ultimate control over all aspects of a show" in any event. JA 774. While the quoted definitions indicate that "producing" a concert can entail various tasks, none requires the entity to carry out every conceivable task across all conceivable features of a show, as the government's "full-service" interpretation requires. On the contrary, the dictionary definitions suggest that "producing" may entail different activities that are not all encompassing: *e.g.*, "administer[ing] the staging *** *or* the financial and managerial aspects," JA 774 (emphasis added) (quoting *Oxford's English Dictionary*); or "supervis[ing] and control[ling] the

_____

[9] Even the (extra-record) authority the government cited in the district court—a job description for "Concert/Event Producer" from the Berklee College of Music—stresses that the live entertainment industry is "notorious for flexible job descriptions," that a precise meaning of "concert and event producers [is] among the most difficult to pin down," and that "every event requires a different approach" to understanding the producer's role. BERKLEE COLL. OF MUSIC, *What does a Concert / Event Producer do?,* https://www.berklee.edu/careers/roles/concertevent-producer. The district court erred in disregarding the context-specific, "flexible definition" of "produces" that the record indicates is commonplace in the industry (and is regularly applied to Concert Investor). JA 779.

43

administrative, financial, and commercial aspects of staging a show or performance," but not any of the creative elements, *id.* (quoting *Am. Heritage Dictionary of the English Language* (5th ed. 2022); or "supervis[ing] *or* financ[ing]" the performance, with scant else, *id.* (emphasis added) (quoting *Merriam-Webster's Dictionary*). None of these definitions requires an entity to perform *every* activity in the "range of services" for which the SBA has previously awarded grants—*e.g.*, "provid[ing] original content, music composition and arrangement, creative development, costuming, directing choreography, project management," and more. JA 109-110. And none necessarily excludes "assum[ing] near or total responsibility for the lighting and sound"—*i.e.*, undertaking "responsib[ility] for some designs, equipment, logistics occasional transportation, and more," in addition to "contract[ing] with vendors"—for lighting- and sound-intensive concerts of the sort that Concert Investor produces (and designs, organizes, manages, etc.). JA 779, 781.

Tellingly, most of the district court's dictionary citations define the term "producer" (a noun), rather than the statutory term "produces" (a verb). *See* JA 774-775; *see also* JA 777-779, 784; *cf.* 15 U.S.C.

44

§ 9009a(a)(1)(A) (making "live performing arts organization operator[s]" eligible for grant funding *in addition to* "theatrical producer[s]").  Even if the court were correct about a necessarily all-encompassing "role of a *producer*," that "comprehensive definition" would not necessarily exclude from the statutory definition an entity that "*produces*" a concert in certain (but not all) respects.  JA 774 (emphasis added).  Indeed, in both common and industry parlance, multiple persons or entities often are involved in "produc[ing]" (or "organiz[ing]," "manag[ing]," etc.) a live event.  15 U.S.C. § 9009a(a)(3)(A)(i)(I); *see, e.g.*, JA 672-673 (show credits listing "Executive Producer," "Production Designer," and "Line Producer").  But under the district court's construction, if two or more entities divide up the responsibilities for handling "essentially all aspects of the show," then none produces it.  Thus, because Concert Investor indisputably "had significant responsibilities" for the Banditø Tøur, JA 779, the court's interpretation implies that *no* entity could be credited with "producing" the shows—even though the government acknowledges

45

that "every concert has at least one producer," JA 805:15-22 (emphasis added).[10]

*Third*, the construction the district court embraced violates several basic canons of statutory construction. Injecting the "full service" qualifier into the statutory definition of a live performing arts organization operator, JA 777, impermissibly "read[s] an absent word into the statute." *Lamie v. United States Tr.*, 540 U.S. 526, 538 (2004). Adding that modifier to "produces" also makes little sense in light of the neighboring statutory terms, such as "promotes" or "hosts," which concern discrete elements of putting on a show. *See also, e.g.*, *Yates v. United States*, 574 U.S. 528, 543 (2015) (under "the principle of *noscitur a sociis* \*\*\* a word is known by the company it keeps").

Moreover, the term "produces" is surrounded by a series of broad, disjunctive terms ("organizes," "hosts," "promotes," and "manages"),

---

[10] At the summary judgment hearing, SBA's counsel surmised that, "as to who's the producer here, [his] best guess is Live Nation." JA 805:23-24. That "guess" is refuted by the SBA Decision itself, which acknowledges that Live Nation "operated and promoted" "a majority of the *venues*." JA 107 (emphasis added). And Concert Investor's contract with Live Nation states that *Concert Investor* provided the production services for the twenty øne piløts concert at Live Nation's venue. JA 689.

indicating that Congress intended the provision to expansively encompass any entity exercising *any* of the specified functions—not to define the term narrowly to capture only entities that carry out *all* of the specified functions.  But construing "produces" to refer necessarily to "the entity responsible for essentially all of a concert," JA 782, would swallow the other activities specified in the statutory definition, rendering those adjacent terms "altogether redundant," *Mercy Hosp., Inc. v. Azar*, 891 F.3d 1062, 1068 (D.C. Cir. 2018) (quoting ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 176-177 (2012)).

*Finally*, the district court's "full-service producer" gloss (JA 777) runs contrary to congressional intent.  Congress intended to provide critical financial support for the wide range of live performing arts small businesses—whether for-profit, non-profit, or government-owned, 15 U.S.C. § 9009a(a)(3)(B)—whose activities were brought to a standstill by the pandemic.  Indeed, the title of the Act—The Economic Aid to Hard-Hit *Small Businesses*, Nonprofits, and Venues Act—tells the story.  Yet under the district court's restrictive reading, the only entities that could be considered "producers" would apparently be corporate behemoths like

47

"Live Nation."  *See* JA 805:23-24 (SBA's counsel surmising that, "as to who's the producer here, [his] best guess is Live Nation.").  Yet that construction runs headlong into Congress's specific determination to exclude such large, publicly traded companies from the program.  *See* 15 U.S.C. § 9009a(a)(1)(A)(vi)(I)-(II) (excluding live performing arts organization operators that, *e.g.*, issue securities "on a national securities exchange" or that own or operate venues  "in more than 10 States" and "[e]mploy[] more than 500 employees").[11]

The district court's reading also undermines Congress's intent for the money awarded to businesses like Concert Investor to flow to the "sound engineer[s], "booker[s]," "promoter[s]," "stage manager[s]," "[s]ecurity personnel," and "box officer manager[s]" they hire.  15 U.S.C. § 9009a(a)(1)(A)(iii).  As the SBA recognized, Concert Investor was the entity that hired the "subcontractors to install and operate the necessary equipment during a concert," JA 108, along with stage managers and

---

[11] Publicly traded Live Nation earned over $6 billion in revenue in the third quarter of 2022 alone.  *See* Glenn Peoples, *Live Nation Turns in Record Quarter as Touring Business Booms*, BILLBOARD, Nov. 3, 2022, https://www.billboard.com/pro/live-nation-record-quarter-earnings-touring-business-booms/.

other critical concert personnel, *see* JA 655, 678, 684-688 (invoices for

power generation and distribution, stage managers, video directors, and

content creator). In nevertheless granting summary judgment to the

agency, the district court failed to consider this aspect of the "broader

context of the statute as a whole." *State of Wisconsin v. EPA*, 938 F.3d

303, 313 (D.C. Cir. 2019) ("A reasonable statutory interpretation of the

Provision must account for the broader context of the statute as a whole,"

including "[t]he Act's central object." (citations, ellipsis, and internal

quotation marks omitted)).

### D.    In All Events, A "Lighting And Sound Producer" Is Still A "Producer"

Even accepting the SBA's stingy conclusion that Concert Investor

was "involved *solely* with lighting and sound," JA 110 (emphasis added),

the agency's decision was *still* arbitrary and capricious. That is because

the record reflects that lighting and sound are integral, not incidental, to

the immersive experience these live concerts offer to the audience,

providing "the production's most stunning moments." JA 662. The

Decision never explains why an entity's production of those essential

elements of Concert Investor's shows should not qualify it as a "producer"

of live events. JA 109 (stating generally that "the limited services which

Concert Investor provided for its client renders it ineligible for a" grant).
Denying Concert Investor's application because its principal duties for
*rock music concerts* involved "lighting" and "sound" is akin to denying a
ballet producer's application because its principal duties for dance
performances involved "music" and "choreography."

Take, for example, twenty øne piløts' explanation that, because
"color means a lot to our brand," their concerts "rely[] heavily on video
content" and lighting interwoven with the songs' storytelling to
communicate a plot throughout the show.  JA 661 ("our color palette goes
back and forth from red and white to green and yellow, because there is
a battle going on between the antagonists and the banditos, our heroes";
later, yellow and red "show that the battle has become a constant
struggle"; the last song is green and yellow, reflecting "the resolve").  Or
consider the elaborate bridge Concert Investor conceived of, built, and
operated, which served as a "key scenic element" on the Banditø Tøur,
"illustrat[ing] the struggle between two places" that forms the "theme" of
the album, intended to "represent" various things in the audience
members' lives, like "a relationship, a decision you have to make, or a life
struggle."  JA 659.  For just that tour alone, Concert Investor was

responsible for close to "107 pages of creative elements," "started work on the production 14 months before the tour started," and spent 60 days "program[ming], sometimes up to 1,000 lighting cues per song," as "the coolest part of the creative process." JA 658, 661.

In other words, lighting and sound are central to the production of Concert Investor's shows. In contrast, several of the tasks that were critical to the shows of eligible entities like Matt Davenport Productions, such as "costuming" and dance "choreography," JA 109, are ancillary to the types of concerts Concert Investor produced. Yet without explanation, the SBA selectively credited some of these functions and not others, divorced from a record-based understanding of the functions relevant to this application.

In sum, undertaking "total responsibility for the lighting and sound" of Concert Investor's *lighting- and sound-intensive tours*, JA 781, is comparable to the services (such as "provid[ing] original content," "creative development," and "directing") that the agency found made other entities eligible, JA 109-110. By nonetheless categorically discounting lighting and sound functions as activities that could constitute "producing," the SBA ignored the nature of the relevant shows

described extensively in the record, and the comprehensive manner in which Concert Investor "put[] it all together."  JA 671; *see American Ass'n of Cosmetology Schools v. Devos*, 258 F. Supp. 3d 50, 73 (D.D.C. 2017) (finding arbitrary and capricious agency's "wooden use" of a general methodology that failed to account for undisputed practical realities); *see also State Farm*, 463 U.S. at 43 (agency must provide "rational connection between the facts found and the choice made").

## II.   AT A MINIMUM, REMAND TO THE AGENCY IS REQUIRED

### A.   The District Court Erred In Crediting The Agency's *Post Hoc* Interpretation Of The Word "Produces"

"It is a 'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'"  *Department of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1907 (2020) (quoting *Michigan v. EPA*, 576 U.S. 743, 758 (2015)); *see SEC v. Chenery Corp.*, 318 U.S. 80, 95 (1943) (an agency's decision "cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained").  The agency "may elaborate later" on "the determinative reason[s] for the final action taken," "but may not provide new ones."  *Regents of the Univ. of Cal.*, 140 S. Ct. at 1908 (citation

omitted).  That rule "applies to rationalizations offered for the first time in *** arguments of counsel."  *Alpharma, Inc. v. Leavitt*, 460 F.3d 1, 6 (D.C. Cir. 2006) (quoting *Local 814, Int'l Bhd. Of Teamsters v. NLRB*, 546 F.2d 989, 992 (D.C. Cir. 1976)).

The district court failed to limit its review of the SBA Decision to the grounds invoked originally by the agency.  It acknowledged that "the appropriate definition" of the key statutory term "produces" is "not a simple interpretive question," that "the SBA had not previously offered" or "expressly state[d] such a definition," and that the SBA had not "directly articulate[d] [its] reasoning."  JA 773-775.  Nevertheless, the court embraced the DOJ's made-for-litigation argument:  that the definition of "produces" requires an entity to be "ultimately responsible for essentially all aspects of putting a concert together."  JA 773.

That error should not stand.  The court reasoned that the SBA's Decision "strongly implied" the definition of "produces" asserted in the agency's litigation brief.  JA 774.  Not so.  While the agency held that a "service provider for lighting and sound" is *not* a producer, *see* JA 108, it neither explained why nor elaborated on what an applicant must do to be a producer.  That defect is underscored by the inconsistent "range of

services" the agency cited with respect to Concert Investor's competitors that did qualify as live performing arts organization operators.  JA 109-110; *see* pp. 31-32, *supra*.  If anything, the SBA's *ad hoc* discussion of Concert Investor's competitors is nearer to the "flexible definition of 'producer'" reflected in the record than the "full service" definition the district court embraced.  JA 774.

The district court also reasoned that the SBA's reliance on the definition of *theatrical producer—i.e.*, a different Shuttered Venue Operators Grant eligibility category—"suggests the term would carry similarly broad responsibilities in the live concert context."  JA 775.  But Congress's decision to make live performing arts organization operators eligible for grants *in addition to* "theatrical producer[s]" makes clear that the two types of entities are not required to carry out all the same functions to "produce" events.  15 U.S.C. § 9009a(a)(1)(A), (3).

At bottom, rather than merely providing an "amplified articulation" of the SBA's original reasoning, JA 775 (citation omitted), the government settled on a "'convenient litigating position'" that "force[d] *** litigants and courts to chase a moving target," *Regents of the U. of Cal.*, 140 S. Ct. at 1908 (alteration omitted) (*quoting Christopher v.*

*SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012)).  Because the SBA Decision provided no affirmative definition of "produces," Concert Investor had no way to critique that (nonexistent) definition.  Thus, while Concert Investor's initial summary judgment brief focused on challenging the SBA's lighting-and-sound-provider conclusion, the agency's *post hoc* litigating position forced Concert Investor to expand its arguments midstream to refute the "full service," "all aspects" definition the government articulated for the first time in court.  JA 774.  Because it is undisputed that the agency has never "expressly state[d]" a definition of "produces," at a bare minimum the agency should have been tasked with articulating a definition consistent with the statute in the first instance.

## B.   The District Court Erred In Granting Summary Judgment On Concert Investor's Claim Of Disparate Treatment

Remand to the agency is also required for the separate reason that the administrative record did not resolve Concert Investor's disparate-treatment claim.  "It is axiomatic that an agency must treat similar cases in a similar manner unless it can provide a legitimate reason for failing to do so."  *Kreis v. Secretary of Air Force*, 406 F.3d 684, 687 (D.C. Cir.

2005) (alteration and internal quotation marks omitted) (quoting *Independent Petroleum Ass'n of Am. v. Babbitt*, 92 F.3d 1248, 1258 (D.C. Cir. 1996)); *accord, e.g.*, *Westar Energy, Inc. v. Federal Energy Regul. Comm'n*, 473 F.3d 1239, 1241 (D.C. Cir. 2007) ("A fundamental norm of administrative procedure requires an agency to treat like cases alike."). "On arbitrary and capricious review, [the agency] bears the burden 'to provide some reasonable justification for any adverse treatment relative to similarly situated competitors.'" *Baltimore Gas & Elec. Co. v. Federal Energy Regul. Comm'n*, 954 F.3d 279, 283 (D.C. Cir. 2020) (quoting *ANR Storage Co. v. Federal Energy Regul. Comm'n*, 904 F.3d 1020, 1025 (D.C. Cir. 2018)).

The SBA admitted that it had treated three similarly situated competitors differently from Concert Investor, and could not justify that differential treatment. *See* JA 110. Rather than remedy the disparity by treating Concert Investor consistently, however, the agency stated that it was "reevaluating and reconsidering the eligibility" of the three entities, and might seek to recoup the funds. *Id.* As two other federal courts recently recognized in granting summary judgment to the plaintiffs, such "uncertain plans" to recoup Shuttered Venue Operators

56

Grant funds in the future are insufficient to remedy arbitrary agency action. Mem. Op. 9-10 n.2, *MomoCon, LLC v. Small Bus. Admin.*, No. 1:21-cv-02386-RC (D.D.C. Feb. 10, 2022), ECF No. 32 (JA 120-121); Order 11, *Sokol World Ent., Inc. v. Small Bus. Admin.*, No. 1:21-cv-02385-TSC (D.D.C. Sept. 28, 2022), ECF No. 47. In line with those holdings, the district court should have granted summary judgment to Concert Investor and remanded to the agency.

Instead, the district court granted summary judgment to the *agency*. That was error, both procedurally and substantively.

As to the former misstep, the district court relied on new evidence not in the administrative record. "[I]t is black-letter administrative law that in an APA case, a reviewing court should have before it neither more nor less information than did the agency when it made its decision." *Hill Dermaceuticals, Inc. v. Food & Drug Admin.*, 709 F.3d 44, 47 (D.C. Cir. 2013) (per curiam) (internal quotation marks omitted). Exceptions to that rule are "quite narrow and rarely invoked," and are "primarily limited to cases where the procedural validity of the agency's action remains in serious question, or the agency affirmatively excluded

relevant evidence." *CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014) (internal citations and quotation marks omitted).

After Concert Investor brought this lawsuit, the government submitted to the district court a declaration stating that the agency (i) had determined those three competitors were ineligible for awards, (ii) is developing a process for recovering the awards, and (iii) will make an effort to recoup the three competitors' awards. JA 741. The district court held that "[t]he agency need not do more." JA 783. Yet, in considering the government's affidavit, the district court did not find any of the circumstances where this Court has found extra-record evidence to be permissible: "(1) if the agency deliberately or negligently excluded documents that may have been adverse to its decision, (2) if background information was needed to determine whether the agency considered all the relevant factors, or (3) if the agency failed to explain administrative action so as to frustrate judicial review." *City of Dania Beach v. FAA*, 628 F.3d 581, 590 (D.C. Cir. 2010) (citation and internal quotation marks omitted).

Beyond that procedural violation, the district court erred in accepting the agency's declaration as a means of curing the admittedly

disparate treatment.  The SBA stated that the recovery process is "still under development," gave no assurance about when it would be operative, and asserted only that the agency will make "an effort" to recoup the awards once the process is in place.  JA 748 ¶ 6.  Given the acknowledged uncertainty over how and when (and how much) the agency will recoup, the district court should have remanded for the SBA to sort out the problems it created through its differential treatment.  It should not have rewarded the SBA for its own mistake by granting judgment *to the agency*.

That is especially true given that, to this day, Concert Investor continues to suffer adverse consequences from the agency's "honest mistake."  JA 783.  The company has operated at a distinct disadvantage relative to the competitors who had the capital (in the form of Shuttered Venue Operators Grant funds) that Concert Investor lacked coming out of the pandemic, and who could use those millions of dollars in grants to bid on the large-scale concerts that Concert Investor could not.  *See* JA 573; *see* JA 23-27 ¶¶ 8-9, 14-20.  A federal agency should not be permitted to "pick winners and losers in this way."  *ANR Storage Co*, 904 F.3d at 1025-26.  Rather than granting summary judgment to the government,

59

the district court should have remanded the matter to the agency to actually remedy the disparity, one way or another.

## CONCLUSION

This Court should reverse the district court's order granting the government's motion for summary judgment with instructions to grant Concert Investor's motion for summary judgment. At a minimum, the Court should vacate the district court's order granting the government's motion for summary judgment with instructions to remand to the agency.

Respectfully submitted,

*/s/ James E. Tysse*
James E. Tysse
Caroline L. Wolverton
Lide E. Paterno
Michael Weisbuch
Michael W. Fires

AKIN GUMP STRAUSS HAUER & FELD LLP

*Attorneys for Plaintiff-Appellant Concert Investor, LLC*

Dated: July 17, 2023

## CERTIFICATE OF COMPLIANCE

The foregoing brief is in 14-point Century Schoolbook proportional font and contains 11,150 words, and thus complies with Federal Rule of Appellate Procedure 32(a) and Circuit Rule 32(e)(1).

Dated:     July 17, 2023

*/s/ James E. Tysse*
James E. Tysse

# CERTIFICATE OF SERVICE

I hereby certify that, on July 17, 2023, I served the foregoing brief upon counsel of record by filing a copy of the document with the Clerk through the Court's electronic docketing system.

*/s/ James E. Tysse*
James E. Tysse

**ADDENDUM**

# TABLE OF CONTENTS

15 USC § 9009a ................................................................................. Add. 1

United States Code

Title 15. Commerce and Trade

Chapter 116. Coronavirus Economic Stabilization (Cares Act)

Subchapter I. Keeping American Workers Paid and Employed

§ 9009a.  Grants for shuttered venue operators

(a) Definitions

In this section:

(1) Eligible person or entity

(A) In general

The term "eligible person or entity" means a live venue operator or promoter, theatrical producer, or live performing arts organization operator, a relevant museum operator, a motion picture theatre operator, or a talent representative that meets the following requirements:

(i) The live venue operator or promoter, theatrical producer, or live performing arts organization operator, the relevant museum operator, the motion picture theatre operator, or the talent representative--

(I) was fully operational as a live venue operator or promoter, theatrical producer, or live performing arts organization operator, a relevant museum operator, a motion picture theatre operator, or a talent representative on February 29, 2020; and

(II) has gross earned revenue during the first, second, third, or, only with respect to an application submitted on or after January 1, 2021, fourth quarter in 2020 that demonstrates not less than a 25 percent reduction from the gross earned revenue of the live venue operator or promoter, theatrical producer, or live performing arts organization operator, the relevant museum operator, the

Add. 1

motion picture theatre operator, or the talent representative during the same quarter in 2019.

(ii) As of the date of the grant under this section--

(I) the live venue operator or promoter, theatrical producer, or live performing arts organization operator is or intends to resume organizing, promoting, producing, managing, or hosting future live events described in paragraph (3)(A)(i);

(II) the motion picture theatre operator is open or intends to reopen for the primary purpose of public exhibition of motion pictures;

(III) the relevant museum operator is open or intends to reopen; or

(IV) the talent representative is representing or managing artists and entertainers.

(iii) The venues at which the live venue operator or promoter, theatrical producer, or live performing arts organization operator promotes, produces, manages, or hosts events described in paragraph (3)(A)(i) or the artists and entertainers represented or managed by the talent representative perform have the following characteristics:

(I) A defined performance and audience space.

(II) Mixing equipment, a public address system, and a lighting rig.

(III) Engages 1 or more individuals to carry out not less than 2 of the following roles:

(aa) A sound engineer.

(bb) A booker.

(cc) A promoter.

(dd) A stage manager.

Add. 2

(ee) Security personnel.

(ff) A box office manager.

(IV) There is a paid ticket or cover charge to attend most performances and artists are paid fairly and do not play for free or solely for tips, except for fundraisers or similar charitable events.

(V) For a venue owned or operated by a nonprofit entity that produces free events, the events are produced and managed primarily by paid employees, not by volunteers.

(VI) Performances are marketed through listings in printed or electronic publications, on websites, by mass email, or on social media.

(iv) A motion picture theatre or motion picture theatres operated by the motion picture theatre operator have the following characteristics:

(I) At least 1 auditorium that includes a motion picture screen and fixed audience seating.

(II) A projection booth or space containing not less than 1 motion picture projector.

(III) A paid ticket charge to attend exhibition of motion pictures.

(IV) Motion picture exhibitions are marketed through showtime listings in printed or electronic publications, on websites, by mass mail, or on social media.

(v) The relevant museum or relevant museums for which the relevant museum operator is seeking a grant under this section have the following characteristics:

(I) Serving as a relevant museum as its principal business activity.

(II) Indoor exhibition spaces that are a component of the principal business activity and which have been subjected to pandemic-related occupancy restrictions.

Add. 3

(III) At least 1 auditorium, theater, or performance or lecture hall with fixed audience seating and regular programming.

(vi)(I) The live venue operator or promoter, theatrical producer, or live performing arts organization operator, the relevant museum operator, the motion picture theatre operator, or the talent representative does not have, or is not majority owned or controlled by an entity with, any of the following characteristics:

(aa) Being an issuer, the securities of which are listed on a national securities exchange.

(bb) Receiving more than 10 percent of gross revenue from Federal funding during 2019, excluding amounts received by the live venue operator or promoter, theatrical producer, or live performing arts organization operator, the relevant museum operator, the motion picture theatre operator, or the talent representative under the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5121 et seq.).

(II) The live venue operator or promoter, theatrical producer, or live performing arts organization operator, the relevant museum operator, the motion picture theatre operator, or the talent representative does not have, or is not majority owned or controlled by an entity with, more than 2 of the following characteristics:

(aa) Owning or operating venues, relevant museums, motion picture theatres, or talent agencies or talent management companies in more than 1 country.

(bb) Owning or operating venues, relevant museums, motion picture theatres, or talent agencies or talent management companies in more than 10 States.

(cc) Employing more than 500 employees as of February 29, 2020, determined on a full-time equivalent basis in accordance with subparagraph (C).

(III) For purposes of applying the characteristics described in subclauses (I) and (II) to an entity owned by a State or a political subdivision of a State, the relevant entity--

(aa) shall be the live venue operator or promoter, theatrical producer, or live performing arts organization operator, the relevant museum operator, the motion picture theatre operator, or the talent representative; and

(bb) shall not include entities of the State or political subdivision other than the live venue operator or promoter, theatrical producer, or live performing arts organization operator, the relevant museum operator, the motion picture theatre operator, or the talent representative.

(IV) Redesignated (III)

## (B) Exclusion

The term "eligible person or entity" shall not include a live venue operator or promoter, theatrical producer, or live performing arts organization operator, a relevant museum operator, a motion picture theatre operator, or a talent representative that--

(i) presents live performances of a prurient sexual nature; or

(ii) derives, directly or indirectly, more than de minimis gross revenue through the sale of products or services, or the presentation of any depictions or displays, of a prurient sexual nature.

## (C) Calculation of full-time employees

For purposes of determining the number of full-time equivalent employees under subparagraph (A)(vi)(II)(cc) of this paragraph and under paragraph (2)(E)--

(i) any employee working not fewer than 30 hours per week shall be considered a full-time employee; and

(ii) any employee working not fewer than 10 hours and fewer than 30 hours per week shall be counted as one-half of a full-time employee.

## (D) Multiple business entities

Each business entity of an eligible person or entity that also meets the requirements under subparagraph (A) and that is not described in subparagraph (B) shall be treated by the Administrator as an independent, non-affiliated entity for the purposes of this section.

## (2) Exchange; issuer; security

The terms "exchange", "issuer", and "security" have the meanings given those terms in section 78c(a) of this title.

## (3) Live venue operator or promoter, theatrical producer, or live performing arts organization operator

The term "live venue operator or promoter, theatrical producer, or live performing arts organization operator"--

(A) means--

(i) an individual or entity--

(I) that, as a principal business activity, organizes, promotes, produces, manages, or hosts live concerts, comedy shows, theatrical productions, or other events by performing artists for which--

(aa) a cover charge through ticketing or front door entrance fee is applied; and

(bb) performers are paid in an amount that is based on a percentage of sales, a guarantee (in writing or standard contract), or another mutually beneficial formal agreement; and

(II) for which not less than 70 percent of the earned revenue of the individual or entity is generated through, to the extent related to a live event described in subclause (I), cover charges or ticket sales,

production fees or production reimbursements, nonprofit educational initiatives, or the sale of event beverages, food, or merchandise; or

(ii) an individual or entity that, as a principal business activity, makes available for purchase by the public an average of not less than 60 days before the date of the event tickets to events--

(I) described in clause (i)(I); and

(II) for which performers are paid in an amount that is based on a percentage of sales, a guarantee (in writing or standard contract), or another mutually beneficial formal agreement; and

(B) includes an individual or entity described in subparagraph (A) that--

(i) operates for profit;

(ii) is a nonprofit organization;

(iii) is government-owned; or

(iv) is a corporation, limited liability company, or partnership or operated as a sole proprietorship.

(4) Motion picture theatre operator

The term "motion picture theatre operator" means an individual or entity that--

(A) as the principal business activity of the individual or entity, owns or operates at least 1 place of public accommodation for the purpose of motion picture exhibition for a fee; and

(B) includes an individual or entity described in subparagraph (A) that--

(i) operates for profit;

(ii) is a nonprofit organization;

Add. 7

   **(iii)** is government-owned; or

   **(iv)** is a corporation, limited liability company, or partnership or operated as a sole proprietorship.

  **(5) National securities exchange**

The term "national securities exchange" means an exchange registered as a national securities exchange under section 78f of this title.

  **(6) Nonprofit**

The term "nonprofit", with respect to an organization, means that the organization is exempt from taxation under section 501(a) of Title 26.

  **(7) Relevant museum**

The term "relevant museum"--

   **(A)** has the meaning given the term "museum" in section 9172 of Title 20; and

   **(B)** shall not include any entity that is organized as a for-profit entity.

  **(8) Seasonal employer**

The term "seasonal employer" has the meaning given that term in subparagraph (A) of section 636(a)(36) of this title, as amended by this Act.

  **(9) State**

The term "State" means--

   **(A)** a State;

   **(B)** the District of Columbia;

   **(C)** the Commonwealth of Puerto Rico; and

   **(D)** any other territory or possession of the United States.

  **(10) Talent representative**

The term "talent representative"--

   (A) means an agent or manager that--

   (i) as not less than 70 percent of the operations of the agent or manager, is engaged in representing or managing artists and entertainers;

   (ii) books or represents musicians, comedians, actors, or similar performing artists primarily at live events in venues or at festivals; and

   (iii) represents performers described in clause (ii) that are paid in an amount that is based on the number of tickets sold, or a similar basis; and

   (B) includes an agent or manager described in subparagraph (A) that--

   (i) operates for profit;

   (ii) is a nonprofit organization;

   (iii) is government-owned; or

 (iv) is a corporation, limited liability company, or partnership or operated as a sole proprietorship.

 **(b) Authority**

  **(1) In general**

   **(A) Administration**

The Associate Administrator for the Office of Disaster Assistance of the Administration shall coordinate and formulate policies relating to the administration of grants made under this section.

   **(B) Certification of need**

An eligible person or entity applying for a grant under this section shall submit a good faith certification that the uncertainty of current

economic conditions makes necessary the grant to support the ongoing operations of the eligible person or entity.

## (2) Initial grants

### (A) In general

The Administrator may make initial grants to eligible persons or entities in accordance with this section.

### (B) Initial priorities for awarding grants

#### (i) First priority in awarding grants

During the initial 14-day period during which the Administrator awards grants under this paragraph, the Administrator shall only award grants to an eligible person or entity with revenue, during the period beginning on April 1, 2020 and ending on December 31, 2020, that is not more than 10 percent of the revenue of the eligible person or entity during the period beginning on April 1, 2019 and ending on December 31, 2019, due to the COVID-19 pandemic.

#### (ii) Second priority in awarding grants

During the 14-day period immediately following the 14-day period described in clause (i), the Administrator shall only award grants to an eligible person or entity with revenue, during the period beginning on April 1, 2020 and ending on December 31, 2020, that is not more than 30 percent of the revenue of the eligible person or entity during the period beginning on April 1, 2019 and ending on December 31, 2019, due to the COVID-19 pandemic.

#### (iii) Determination of revenue

For purposes of clauses (i) and (ii)--

(I) any amounts received by an eligible person or entity under the CARES Act (Public Law 116-136; 134 Stat. 281) or an amendment made by the CARES Act shall not be counted as revenue of an eligible person or entity;

**(II)** the Administrator shall use an accrual method of accounting for determining revenue; and

**(III)** the Administrator may use alternative methods to establish revenue losses for an eligible person or entity that is a seasonal employer and that would be adversely impacted if January, February, and March are excluded from the calculation of year-over-year revenues.

### (iv) Limit on use of amounts for priority applicants

The Administrator may use not more than 80 percent of the amounts appropriated under section 323(d)(1)(H) of this Act to carry out this section to make initial grants under this paragraph to eligible persons or entities described in clause (i) or (ii) of this subparagraph that apply for a grant under this paragraph during the initial 28-day period during which the Administrator awards grants under this paragraph.

### (C) Grants after priority periods

After the end of the initial 28-day period during which the Administrator awards grants under this paragraph, the Administrator may award an initial grant to any eligible person or entity.

### (D) Limits on number of initial grants to affiliates

Not more than 5 business entities of an eligible person or entity that would be considered affiliates under the affiliation rules of the Administration may receive a grant under this paragraph.

### (E) Set-aside for small employers

### (i) In general

Subject to clause (ii), not less than $2,000,000,000 of the total amount of grants made available under this paragraph shall be awarded to eligible persons or entities which employ not more than 50 full-time employees, determined in accordance with subsection (a)(1)(C).

### (ii) Time limit

Clause (i) shall not apply on and after the date that is 60 days after the Administrator begins awarding grants under this section and, on and after such date, amounts available for grants under this section may be used for grants under this section to any eligible person or entity.

## (3) Supplemental grants

### (A) In general

Subject to subparagraph (B), the Administrator may make a supplemental grant in accordance with this section to an eligible person or entity that receives a grant under paragraph (2) if, as of April 1, 2021, the revenues of the eligible person or entity for the most recent calendar quarter are not more than 30 percent of the revenues of the eligible person or entity for the corresponding calendar quarter during 2019 due to the COVID-19 pandemic.

### (B) Processing timely initial grant applications first

The Administrator may not award a supplemental grant under subparagraph (A) until the Administrator has completed processing (including determining whether to award a grant) each application for an initial grant under paragraph (2) that is submitted by an eligible person or entity on or before the date that is 60 days after the date on which the Administrator begins accepting such applications.

## (4) Certification

An eligible person or entity applying for a grant under this section that is an eligible business described in the matter preceding subclause (I) of section 4003(c)(3)(D)(i) of the CARES Act (15 U.S.C. 9042(c)(3)(D)(i)), shall make a good-faith certification described in subclauses (IX) and (X) of such section.

## (c) Amount

### (1) Initial grants

### (A) In general

Subject to subparagraphs (B) and (C), a grant under subsection (b)(2) shall be in the amount equal to the lesser of--

 (i)(I) for an eligible person or entity that was in operation on January 1, 2019, the amount equal to 45 percent of the gross earned revenue of the eligible person or entity during 2019; or

 (II) for an eligible person or entity that began operations after January 1, 2019, the amount equal to the product obtained by multiplying--

 (aa) the average monthly gross earned revenue for each full month during which the eligible person or entity was in operation during 2019; by

 (bb) 6; or

 (ii) $10,000,000.

### (B) Application to relevant museum operators

A relevant museum operator may not receive grants under subsection (b)(2) in a total amount that is more than $10,000,000 with respect to all relevant museums operated by the relevant museum operator.

### (C) Reduction for recipients of new PPP loans

 #### (i) In general

The otherwise applicable amount of a grant under subsection (b)(2) to an eligible person or entity shall be reduced by the total amount of loans guaranteed under paragraph (36) or (37) of section 636(a) of this title that are received on or after December 27, 2020 by the eligible person or entity.

 #### (ii) Application to governmental entities

For purposes of applying clause (i) to an eligible person or entity owned by a State or a political subdivision of a State, the relevant entity--

**(I)** shall be the eligible person or entity; and

**(II)** shall not include entities of the State or political subdivision other than the eligible person or entity.

### (2) Supplemental grants

A grant under subsection (b)(3) shall be in the amount equal to 50 percent of the grant received by the eligible person or entity under subsection (b)(2).

### (3) Overall maximums

The total amount of grants received under paragraphs (2) and (3) of subsection (b) by an eligible person or entity shall be not more than $10,000,000.

## (d) Use of funds

### (1) Timing

#### (A) Expenses incurred

##### (i) In general

Except as provided in clause (ii), amounts received under a grant under this section may be used for costs incurred during the period beginning on March 1, 2020, and ending on December 31, 2021.

##### (ii) Extension for supplemental grants

If an eligible person or entity receives a grant under subsection (b)(3), amounts received under either grant under this section may be used for costs incurred during the period beginning on March 1, 2020, and ending on June 30, 2022.

#### (B) Expenditure

##### (i) In general

Except as provided in clause (ii), an eligible person or entity shall return to the Administrator any amounts received under a grant

under this section that are not expended on or before the date that is 1 year after the date of disbursement of the grant.

### (ii) Extension for supplemental grants

If an eligible person or entity receives a grant under subsection (b)(3), the eligible person or entity shall return to the Administrator any amounts received under either grant under this section that are not expended on or before the date that is 18 months after the date of disbursement to the eligible person or entity of the grant under subsection (b)(2).

### (2) Allowable expenses

### (A) Definitions

In this paragraph--

(i) the terms "covered mortgage obligation", "covered rent obligation", "covered utility payment", and "covered worker protection expenditure" have the meanings given those terms in section 636m(a) of this title, as redesignated, transferred, and amended by this Act; and

(ii) the term "payroll costs" has the meaning given that term in section 636(a)(36)(A) of this title.

### (B) Expenses

An eligible person or entity may use amounts received under a grant under this section for--

(i) payroll costs;

(ii) payments on any covered rent obligation;

(iii) any covered utility payment;

(iv) scheduled payments of interest or principal on any covered mortgage obligation (which shall not include any prepayment of principal on a covered mortgage obligation);

Add. 15

(v) scheduled payments of interest or principal on any indebtedness or debt instrument (which shall not include any prepayment of principal) incurred in the ordinary course of business that is a liability of the eligible person or entity and was incurred prior to February 15, 2020;

(vi) covered worker protection expenditures;

(vii) payments made to independent contractors, as reported on Form-1099 MISC, not to exceed a total of $100,000 in annual compensation for any individual employee of an independent contractor; and

(viii) other ordinary and necessary business expenses, including--

  (I) maintenance expenses;

  (II) administrative costs, including fees and licensing costs;

  (III) State and local taxes and fees;

  (IV) operating leases in effect as of February 15, 2020;

  (V) payments required for insurance on any insurance policy; and

  (VI) advertising, production transportation, and capital expenditures related to producing a theatrical or live performing arts production, concert, exhibition, or comedy show, except that a grant under this section may not be used primarily for such expenditures.

(3) **Prohibited expenses**

An eligible person or entity may not use amounts received under a grant under this section--

  (A) to purchase real estate;

  (B) for payments of interest or principal on loans originated after February 15, 2020;

  (C) to invest or re-lend funds;

Add. 16

(D) for contributions or expenditures to, or on behalf of, any political party, party committee, or candidate for elective office; or

(E) for any other use as may be prohibited by the Administrator.

(e) **Increased oversight of shuttered venue operator grants**

The Administrator shall increase oversight of eligible persons and entities receiving grants under this section, which may include the following:

(1) **Documentation**

Additional documentation requirements that are consistent with the eligibility and other requirements under this section, including requiring an eligible person or entity that receives a grant under this section to retain records that document compliance with the requirements for grants under this section--

(A) with respect to employment records, for the 4-year period following receipt of the grant; and

(B) with respect to other records, for the 3-year period following receipt of the grant.

(2) **Reviews of use**

Reviews of the use of the grant proceeds by an eligible person or entity to ensure compliance with requirements established under this section and by the Administrator, including that the Administrator may--

(A) review and audit grants under this section; and

(B) in the case of fraud or other material noncompliance with respect to a grant under this section--

(i) require repayment of misspent funds; or

(ii) pursue legal action to collect funds.

(f) **Shuttered venue oversight and audit plan**

**(1) In general**

Not later than 45 days after December 27, 2020, the Administrator shall submit to the Committee on Small Business and Entrepreneurship of the Senate and the Committee on Small Business of the House of Representatives an audit plan that details--

  **(A)** the policies and procedures of the Administrator for conducting oversight and audits of grants under this section; and

  **(B)** the metrics that the Administrator shall use to determine which grants under this section will be audited pursuant to subsection (e).

**(2) Reports**

Not later than 60 days after December 27, 2020, and each month thereafter until the date that is 1 year after the date on which all amounts made available under section 323(d)(1)(H) of this Act have been expended, the Administrator shall submit to the Committee on Small Business and Entrepreneurship of the Senate and the Committee on Small Business of the House of Representatives a report on the oversight and audit activities of the Administrator under this subsection, which shall include--

  **(A)** the total number of initial grants approved and disbursed;

  **(B)** the total amount of grants received by each eligible person or entity, including any supplemental grants;

  **(C)** the number of active investigations and audits of grants under this section;

  **(D)** the number of completed reviews and audits of grants under this section, including a description of any findings of fraud or other material noncompliance[; and]

  **(E)** any substantial changes made to the oversight and audit plan submitted under paragraph (1).